IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| I.D. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | |
| | : | _____ |
| Hare Krishna Decatur Hotel, | : | |
| LLC d/b/a Motel 6; Shiv Global | : | |
| Hotel, LLC d/b/a Knights Inn; and | : | |
| Trinity SNK Corporation f/k/a | : | |
| Global Management & | : | |
| Investment Corporation, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Matthew B. Stoddard
Keith N. Evra
The Stoddard Firm
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
keith@legalhelpga.com

**Attorneys for Plaintiff**

# TABLE OF CONTENTS

Introduction ...........................................................**Error! Bookmark not defined.**

Procedural Issues...................................................................................6

Fourteen-Year-Old I.D. Is Trafficked For Sex..........................................8

Defendants Had Extensive Knowledge of Trafficking at Its Hotel.........................14

    A.  The Industry Knowledge...........................................................14

    B.  The Online Reviews...................................................................18

Defendants Had Constructive Knowledge That I.D. Was Being Trafficked ..........23

COUNT 1: TVPRA Civil Beneficiary Claims.......................................................27

COUNT 2: Premises Liability Claim ..................................................................30

COUNT 3: Nuisance Claim ...............................................................................32

Causation and Damages ...................................................................................33

Statute of Limitations .......................................................................................35

Prayer for Relief...............................................................................................35

**INTRODUCTION**

1.      This case involves the sex trafficking of a minor, I.D., at two hotels in DeKalb County, Georgia.

2.      While these hotels are legally owned by separate entities, the same ownership group owns both hotels, and this group used the same corporate affiliate to manage both properties at all relevant times in this Complaint.

3.      The first hotel at issue is the Motel 6 which is located at 2572 Candler Road in Decatur, Georgia 30032 (the "Motel 6"), and which is depicted below:



4.      At all relevant times, Defendant Hare Krishna Decatur Hotel, LLC ("Hare Krishna") has owned, operated, and managed the Motel 6.

5.    The second hotel at issue is the Knights Inn, which is located at 2859 Panola Road, Lithonia, Georgia 30058 (the "Knights Inn), and which is depicted below:



6.    At all relevant times, Defendant Shiv Global Hotel LLC ("Shiv Global") has owned, operated, and managed the Knights Inn.

7.    At all relevant times, Defendant Trinity SNK Corporation, formerly known as known as Global Management & Investment Corporation ("Global Management") assisted Defendant Hare Krishna in operating and managing the Motel 6 and Defendant Shiv Global in operating and managing the Knights Inn.

4

8.     Both the Motel 6 and the Knights Inn are have been notorious hotspots for illict activity that has been attracting sex trafficking and prostitution ventures for years.

9.     I.D. was trafficked at the Motel 6 and the Knights Inn by individuals known to her as "Bino" and "Kevi" or "Kevianna" from approximately October 1, 2017 through February 28, 2021.

10.     The trafficking period of I.D. began when she was only fourteen years old and lasted until after she turned seventeen years old at the Motel 6 and the Knights Inn.

11.     Prior to and during I.D.'s trafficking, Defendants were aware, or should have been aware, of the ongoing prevalence of sex trafficking, prostitution, drug-related offenses, and violent criminal activity occurring at the Motel 6 and the Knights Inn.  This notice arose from publicly available information, including online reviews of the Motel 6 and the Knights Inn, as well as from prior law enforcement activity at the property.

12.     Despite their knowledge, Defendants refused to take any action to deter sex trafficking at the Motel 6 and the Knights Inn.

13.     In addition to their longstanding awareness that rooms at their property were routinely used for sex trafficking ventures, Defendants had constructive

knowledge that I.D. was being trafficked at the Motel 6 and the Knights Inn from approximately October 1, 2017 through February 28, 2021.

14. Despite clear warning signs and repeated indicators of trafficking activity, Defendants chose to ignore I.D.'s situation and continued to rent rooms to I.D.'s trafficker, thereby knowingly allowing and profiting from the continuation of her trafficking.

## PROCEDURAL ISSUES

15. Given the nature of the case, I.D. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed I.D.'s full name to defense counsel or will immediately upon identification of, and request by, defense counsel. When filing the initial Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for I.D. to proceed anonymously. Upon information and belief, Defendant will consent to I.D. proceeding without publicly disclosing her name.

16. Plaintiff I.D. is a resident and citizen of Decatur, Georgia, who is subject to the jurisdiction and venue of this Court.

17. Defendant Hare Krishna is a Georgia limited liability company with its principal place place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, Georgia 30253.

18. Defendant Hare Krishna can be served through its registered agent, Joel M. Haber at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, GA 30253.

19. Defendant Hare Krishna was properly served with process in this matter.

20. Defendant Hare Krishna is subject to the jurisdiction and venue of this Court.

21. Defendant Shiv Global is a Georgia limited liability company with its principal place place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, Georgia 30253.

22. Defendant Shiv Global can be served through its registered agent, Joel M. Haber at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, GA 30253.

23. Defendant Shiv Global was properly served with process in this matter.

24. Defendant Shiv Global is subject to the jurisdiction and venue of this Court.

25. Defendant Global Management is a domestic for-profit corporation with its principal place place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, Georgia 30253.

26.    Defendant Global Management can be served through its registered agent: Joel M. Haber at 2030 Avalon Parkway, Suite 200, McDonough, Henry County, Georgia, 30253.

27.    Defendant Global Management was properly served with process in this matter.

28.    Defendant Global Management is subject to the jurisdiction and venue of this Court.

29.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act which is a law of the United States.

30.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in DeKalb County Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

**FOURTEEN-YEAR-OLD I.D. IS TRAFFICKED FOR SEX**

31.    In 2017, I.D. was a fourteen-year-old minor living in a group home.

32.    After running away from the group home in late 2017, she met "Bino" and "Kevi / Kevianna" at a Citgo gas station in Decatur, Georgia.

33.   Bino and Kevi / Kevianna told I.D. they would help her and take care of her if I.D. would come with them.

34.   I.D. complied.

35.   Instead of helping I.D., Bino and Kevi / Kevianna began selling I.D. for sex and physically abusing her if she did not comply.

36.   Around approximately October 1, 2017, Bino and Kevi / Kevianna took I.D. to Defendants' Motel 6 and Knights Inn to sell her for sex.  Bino and Kevi / Kevianna told I.D. that any money made for these acts would go to them.

37.   Between approximately October 1, 2017 and approximately February 28, 2021, I.D., who was between fourteen and seventeen years old, was forced to have sex for money at Defendants' Motel 6 and Knights Inn

38.   I.D.'s traffickers, Bino and Kevi / Kevianna, rented rooms at the Motel 6 and the Knights Inn from Defendants for use in trafficking I.D.

39.   Defendants collected revenue from the rental of rooms to Bino and Kevi / Kevianna at the Motel 6 and the Knights Inn in which I.D. was forced to have sex.

40.   To control I.D. during the duration of her stays at the Motel 6 and the Knights Inn, Bino and Kevi / Kevianna would threaten I.D. with violence if I.D. did not continue to perform sex work at Defendants' Motel 6 and Knights Inn

41.     Bino and Kevi / Kevianna repeatedly physically and emotionally abused I.D. during the duration of her stays at the Motel 6 and the Knights Inn. The abuse often included beatings which left marks on I.D. face and body.

42.     I.D. was sexually assaulted by various "Johns" on an average of ten to thirteen times per day and well over a thousand times total while at Defendants' Motel 6 and Knights Inn.

43.     Bino and Kevi / Kevianna took the commercial sex act proceeds after these acts.

44.     Bino and Kevi / Kevianna used a portion of these sex act proceeds to then book lodging at the Motel 6 and the Knights Inn for future stays in which I.D. was again and repeatedly sex trafficked.

45.     Upon information and belief, Bino and Kevi / Kevianna used Defendants' Wi-Fi network(s) to advertise I.D. for commercial sex acts online. Using the same network(s), "Johns" responded to these advertisements, communicated with Bino and Kevi / Kevianna to negotiate prices and meeting times, and then arrived at Defendants' Motel 6 and Knights Inn to engage in the sex trafficking of I.D. In this way, Defendants' property and internet services directly facilitated the ongoing trafficking venture.

46.    Upon information and belief, Bino and Kevi / Kevianna paid for use of Defendants' Wi-Fi network either through the room rental fees or as a separate charge.

47.    Throughout the period I.D. was sold for sex at the Motel 6 and the Knights Inn, I.D., a minor, would enter the hotel lobbies of each respective hotel with Bino and Kevi / Kevianna to access the rooms rented to her traffickers by Defendants.

48.    As for Defendants' Motel 6, Defendants routinely rented rooms to Bino and Kevi / Kevianna on the ground floor and in the rear area of the hotel in locations intentionally chosen to conceal their sex trafficking activities and to minimize detection by other guests or law enforcement.

49.    As for Defendants' Knights Inn, Defendants routinely rented rooms to Bino and Kevi / Kevianna on the third floor and in the rear area of the hotel in locations intentionally chosen to conceal their sex trafficking activities and to minimize detection by other guests or law enforcement.

50.    Defendants and their employees had numerous opportunities to observe I.D. on the premises, including in the common areas and walkways of the Motel 6 and the Knights Inn.   I.D. was visibly young, frequently scantily clothed, and regularly seen interacting with adult men coming and going from the rooms rented

by her traffickers, all facts that should have alerted Defendants to the ongoing trafficking activity.

51.    When housekeeping staff attempted to clean the rooms rented by Bino and Kevi / Kevianna, the traffickers routinely refused entry and instead requested that toiletries, including towels, be left outside the door, demonstrating behavior consistent with known indicators of sex trafficking.

52.    On the occasions when housekeeping staff were able to enter those rooms, they discovered multiple used condom wrappers and other clear signs of commercial sex activity, providing further notice to Defendants of the trafficking occurring at the Motel 6 and the Knights Inn.

53.    I.D. was forced (through coercion, violence, and threats of violence) to have sex with men in exchange for money in rooms at the Motel 6 and the Knights Inn that Bino and Kevi / Kevianna rented from Defendants.

54.    Bino and Kevi / Kevianna took the money from these sex acts and used it to re-rent hotel rooms at the Motel 6 and the Knights Inn from Defendants, and then the traffickers forced (through coercion, violence, and threats of violence) I.D. to have sex with men in exchange for money in the rooms over and over again.

55.    Defendants' staff and agents further observed numerous, well-known, and visibly obvious indicators that I.D., a fourteen to seventeen year old minor victim, was being sex trafficked on their premises.  Among these red flags were:

a. Adult men ("Johns") repeatedly entering the Motel 6 and the Knights Inn through the front lobby and in full view of staff, proceeding directly to the room(s) rented by I.D.'s traffickers, and then exiting through the same lobby after short visits consistent with commercial sex transactions;

b. I.D., was very young (between fourteen and seventeen years old) and her traffickers were older (enough so to rent rooms and approximately in their twenties), but clearly not old enough to be I.D.'s parents or guardians;

c. I.D. was malnourished, lacked appropriate hygiene, appeared sleep deprived, inappropriately clothed, without luggage, and at times had signs of physical injury;

d. I.D., a minor, was frequently high on drugs which are easily noticeable, such as the smell of marijuana, or intoxicated on alcohol provided by her traffickers;

e. Bino and Kevi / Kevianna rented rooms by the day and would usually pay in cash;

f. I.D. had no control over money;

g. I.D.'s traffickers consistently denied entry into the hotel rooms rented to them by staff such as housekeeping during consecutive stays despite hotel policy which mandated entry at scheduled intervals for cleaning and yet continued renting to I.D.'s traffickers;

h. When I.D.'s traffickers did converse with Defendants' staff, they consistently and excessively requested towels from housekeeping;

i. I.D. was not wearing appropriate clothing for her age which often included either very scant or revealing clothing;

13

j. I.D. was often plainly visible in the common areas of the hotel associating and communicating with male visitors and guests who were significantly older than she was;

k. I.D. was constantly being monitored by her traffickers, Bino and Kevi / Kevianna, while at Defendants' Motel 6 and Knights Inn;

l. When commercial sex acts were being performed in the hotel rooms by I.D., her traffickers would loiter in Defendants' Motel 6 and the Knights Inn common areas such as the hallways, lobby, and/or parking lot and then return to the room once the "John" left; and,

m. There was heavy foot traffic outside I.D. and her traffickers' hotel room(s) with a constant stream of male visitors entering the room one at a time, staying for a short period, and then leaving the premises entirely.

## DEFENDANTS HAD EXTENSIVE KNOWLEDGE OF TRAFFICKING AT ITS HOTEL

### A. The Industry Knowledge

56.    Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000, and the passage of O.C.G.A. § 16-5-46 in 2007.

57.    Defendants knew or should have known that, in 2013, the acting Attorney General Sam Olens announced a statewide campaign, "Georgia's Not Buying It," to combat child sex trafficking. As part of the campaign, AG Olens'

office "collaborated with partners to conduct trainings and increase awareness," which included "multiple trainings for the hotel industry."[1]

58.    Defendants knew or should have known that the Georgia legislature passed O.C.G.A. § 16-5-47 in 2013, which required hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted…"

59.    Defendants knew or should have known that the Federal Bureau of Investigations ranked Atlanta one of the worst cities in the country for child sex trafficking.[2]

60.    Defendants knew or should have known that as early as 2001, City of Atlanta officials publicly warned of sex trafficking at area hotels and of the

---

[1] *See* https://law.georgia.gov/press-releases/2013-03-18/attorney-general-olens-law-enforcement-announce-campaign-fight-sex (last visited Nov. 13, 2025).

[2] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, Exploiting Americans on American Soil: Domestic Trafficking Exposed, The Federal Bureau of Investigation, (June 7, 2005), available at: https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1011&context=humtraffdata (last visited Nov. 13, 2025).

relationship between prostitution and sex trafficking. At that time, the Atlanta Journal-Constitution published a groundbreaking series called *Selling Atlanta's Children*, explaining the problem of sex trafficking in the City and that hotels are complicit in sex trafficking trade.[3]

61.    Defendants knew or should have known of the Atlanta metro-area's well-publicized reputation as an "epicenter for human trafficking, and particularly child sex trafficking," and as "the number one city for child sex trafficking."[4]

---

[3] Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. '***We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl***,' Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001.

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month*, Jan. 29, 2015 *available at* https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Nov. 13, 2025).

62.     Defendants knew or should have known that in 2007, the Atlanta metro-area's sex trafficking economy was worth almost $300 million annually with traffickers reporting average *weekly* earnings of roughly $33,000.[5]

63.     Defendants knew or should have known that, compared to other types of businesses[6], hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of L.A. v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

---

[5] Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) available at https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Nov. 13, 2025).

[6] *Cf. Sun Tr. Banks, Inc. v. Killebrew*, 266 Ga. 109, 111 (1995) (Sears, J., concurring) ("[T]he banking industry itself anticipates that criminal activity will frequently occur at ATMs."); *Killebrew v. Sun Trust Banks*, 221 Ga. App. 679, 680-81 (1996) (physical precedent only) ("it would be difficult to say that a criminal occurrence at an ATM is unforeseeable as a matter of law.  Indeed, such a conclusion could be reached only by turning 'foreseeability' into a legal term of art totally divorced from its meaning in everyday usage.")

64.    Defendants knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

65.    At all relevant times, Defendants knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that Atlanta area motels were a particular hotbed of sex trafficking, (iii) a long running expose in the premier Atlanta newspaper (the AJC) that exposed the extent of the sex trafficking problem at Atlanta area motels, and (iv) the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

### The Online Reviews

66.    Defendants had actual or constructive knowledge of the publicly available online reviews of the Motel 6 reporting allegations of prostitution and other illicit activities occurring at the Motel 6. Those reviews include comments such as:

> a. "Once it got dark we were terrified to go outside the room. Slamming doors, **gunshots, drug dealing and a prostitution**." (2017 on Google).

b. "[I] saw three blaten drug deals in a matter of 10 minutes. **Plus a pimp and hooker on the corner of the building**!!!! No security and sketchy as heck location!!!!" (2018 on Google).

c. "There were **prostitutes out front and drug dealers**." (2017 on Google).

d. "Let's talk about the **hookers that were loitering in the lobby and out front by the door.** In and out; in and out....they kept coming in and going out over and over." (~2017/2018 on Google).

e. "[I]t's not a Motel 6 is like someone bought into the company and made their own because that is[] a **Riff Raff house for drug dealers and prostitutes** it's awful." (2018 on Google).

f. "Appeared **prostitution and drug consumption and dealing** were a common occurrence here." (2017 on Google).

g. "There were **prostitutes and police[] officers in and out all night**." (2018 on Google).

h. "Thirdly, we could smell marijuana in the hall and **there was open prostitution**." (2017 on Google).

i. "My family and I was afraid to stay at the motel because of the type of people that was coming in and out, there were guys who had thier

guns on them which was visible for all to see (where is the safety of ur guest) to many drug deals going down in this motel 6 ( try and fix the problem) and last but not least **this is not a motel it is a brothel to many prostitute coming in** and 🤔 please try and resolve this situation before something bad happens." (2017 on Google).

j.  "**The lobby had hookers and the desk guy didn't do anything about it.** … There was probably about 30 men just walking around in the parking lot with their alcohol with their hookers." (2018 on Google).

k.  "Also, **my boyfriend was stopped twice in the hallways by people trying to sell him meth and crack. And by another woman selling her body.** So definitely not a family place." (2019 on Google).

l.  "[T]here were "tennants" selling drugs, walking dogs, and smoking weed in the rooms and lobby area. and at night **there was a woman offering "sexual favors in exchange for drugs and or cash**." (2017 on Google).

m.  "There are people offering edibles in the elevator, **working girls knocking on doors looking for work**, the smell of urine throughout

the hotel, and groups hanging out scoping vehicles and the penske!" (2020 on Google).

n. "My favorite part of our stay was being welcomed into the elevator by a gentleman smoking a black 'n mild while welcoming his girlfriend of the evening up to his room. **She was a hooker, guys. A hooker.**" (2017 on Google).

o. "There were loud people outside of my door at 3am and the next morning while getting my refund **there was a prostitute lingering around the lobby** clearly drunk and half naked!" (2017 on Google).

p. "Husband **solicited in parking lot**." (2017 on Google).

q. "In the morning there was an **empty condom box** as well as many cigarettes butts in the hallway." (~2017/2018 on Google).

r. "The parking lot was terrible, trash everywhere including **used condoms**... I accidentally left my shampoo at home, 1600 miles away, I thought I'd be able to get some at the hotel, NOPE unless of course I wanted to pay for it, $1.50 for a tiny pouch in a vending machine that also sold lighters and condoms, wonder if those are the same used condoms I saw in the lot...." (~2017 on Google).

s. "Please don't ever stay at this garbage, **drug infested, hell hole**." (2018 on Google).

t. "The **obvious drug dealing in the parking lot** needs to be addressed by management." (2017 on Google).

u. "This motel is missing two sixes.. it should be Motel 666. **Comforters covered in blood and bodily fluid stains**." (2017 on Google).

(Emphasis in bold added; all other emphasis in original). The reviews quoted in this Complaint, amongst others, will be produced in discovery.

67. Defendant had actual or constructive knowledge of the publicly available online reviews of the Knights Inn reporting allegations of prostitution and other illicit activities occurring at the Knights Inn. Those reviews include comments such as:

a. . . . There was a strange guy lurking around in the parking lot from the time we arrived until the middle of the night. He appeared to be a **pimp with prostitutes** in a room a few doors down from us. . . People giving this place over 1 star must be part of the **pimps and prostitutes**. . . (~2016/2017 on Google).

b. "Ghetto bookers and **hoes and tricks prostitute here**[.]" (2018 on Google).

c. "Nothing but **drugs and prostitutes** at that hotel!!" (2018 on Google).

d. ". . . There was a **shooting** outside my door the first night there." (~2016/2017 on Google).

(Emphasis in bold added; all other emphasis in original). The reviews quoted in this Complaint, amongst others, will be produced in discovery.

68.    The online reviews provided Defendants with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Motel 6 and the Knights Inn.

69.    The online reviews even reference reporting findings to the Defendant's staff at the Motel 6 and the Knights Inn, including management, regarding finding items that are associated with prostitution and illicit activity further supporting the inference that Defendants had actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Motel 6 and the Knights Inn.

**DEFENDANTS HAD CONSTRUCTIVE KNOWLEDGE THAT I.D. WAS BEING TRAFFICKED**

70.    Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Motel 6 and the Knights Inn at all relevant times giving Defendant knowledge of sex trafficking, including the sex trafficking that victimized I.D., and other crimes at the hotel during the relevant period.

71.    During the period she was trafficked at the Motel 6 and the Knights Inn, I.D. would contantly be shuffled in and out of the hotel through the front lobby to enter and exit the premises with her traffickers Bino and Kevi.

72.    Bino, Kevi, and I.D. were familiar enough with the clerks working the desk during the night shift that the clerks would greet them each time they arrived.

73.    Upon information and belief, at the Motel 6, Defendants would rent Bino and Kevi the hotel rooms near the back of the building on the ground floor to provide private, easy access to and from the room and to make it more difficult for police to determine that something different – something besides a normal room rental – was occurring.

74.    Upon information and belief, at the Knights Inn, Defendants would rent Bino and Kevi the hotel rooms on the rear of the property on the third floor to provide private, easy access to and from the room and to make it more difficult for police to determine that something different – something besides a normal room rental – was occurring.

75.    While I.D. was being trafficked in the rooms at the Motel 6 and the Knights Inn, Bino, Kevi and their associates would wait at the front of the hotel or sometimes in the lobby of the hotel.

76.    From October 2017 through February 2021, Defendants had ample

24

opportunity to observe the numerous, well-known, and visible signs of a minor sex trafficking victim that I.D. exhibited. These included, but were not limited to:

   a. I.D. was very young (14 - 17 years old) and Bino was much older (approximately 26 years old);

   b. I.D. was not wearing appropriate clothing for her age and was often wearing very little clothing or revealing clothing;

   c. I.D. was the age of someone who should be in school, but she was not in school and spent weeks and months at the hotel;

   d. I.D. would often loiter in the parking lot of the hotel and could be seen associating with men much older than she was;

   e. I.D. had signs of physical injury;

   f. I.D. had signs of excessive drug and alcohol use;

   g. Bino would stand near or at the door of the hotel room where I.D. was; and,

   h. There was heavy foot traffic to and from the room where I.D. was staying.

77.    When hotel housekeeping staff would come to the rooms where I.D. was being trafficked, Bino and Kevi (or I.D. at Bino's direction) would refuse housekeeping's services when they asked to clean the room and instead, asked for exorbitant amounts of towels directly from the front desk or housekeeping without allowing entrance into the rooms.

25

78.    I.D.'s victimization followed a pattern that was readily observable and should have been obvious to hotel employees based on information available to the public at large and to the hotel industry, and consequently, Defendants and their employees and agents had constructive knowledge of I.D.'s sex trafficking.

79.    Rather than taking reasonable steps to prevent sex trafficking, Defendants – in the quest for profits – created and maintained business models that attract, facilitate, and encourage the commercial sex market by providing a private and anonymous venue for traffickers and buyers alike.

80.    I.D.'s sex trafficking at the Motel 6 and the Knights Inn was a foreseeable and preventable result of Defendants failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its hotel and failing to prevent I.D.'s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

### COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS

81.    The TVPRA, 18 U.S.C. § 1595(a), provides a civil cause of action to victims like I.D. against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" minor sex trafficking or forced labor sex trafficking.

82.    Defendants "knowingly benefited" from I.D.'s trafficking because:

a.  Bino and Kevi, I.D.'s traffickers, rented rooms at the Motel 6 and the Knights Inn;

b.  Bino and Kevi used Defendants' WiFi network at the Motel 6 and the Knights Inn;

c.  I.D. was advertised for sex through the WiFi network and forced to have sex in the rooms; and

d.  Defendants collected revenue from the room rentals and the use of the WiFi network.

83.  Defendants took part in a common undertaking involving risk or profit with Bino and Kevi, the traffickers, because:

a.  Bino and Kevi would pay in cash for one night at a time, booking the next night's stay before check-out time;

b.  Defendants directly rented rooms to people it knew or should have known were engaged in sex trafficking, including the trafficking of I.D.;

c.  Defendants was directly renting rooms to the same trafficker(s) – Bino and Kevi;

d.  Defendants' employees knew and were friendly with Bino and Kevi, including the front desk employees;

e.  Defendants purposefully rented rooms to Bino and Kevi that were on the backside of the property, and on the ground floor at Motel 6, and on the third floor at Knights Inn to allow for more privacy and easier access and to make it more difficult for police to determine the illicit activity that was occurring; and,

f.  Defendants owned, operated, and maintained the Motel 6 and the Knights Inn.

84.    I.D.'s traffickers' undertaking with Defendants violated the TVPRA with respect to I.D. because:

a.  Bino and Kevi recruited I.D. to participate in commercial sex acts at the Motel 6 and the Knights Inn by, among other reasons, stating that they would take care of her and then making her work as a prostitute;

b.  Bino and Kevi harbored I.D. at the Motel 6 and the Knights Inn for the purpose of I.D. participating in commercial sex acts at the property;

c.  Bino and Kevi transported I.D. to the Motel 6 and the Knights Inn for the purpose of I.D. participating in commercial sex acts on the property;

d.  The commercial sex acts occurred at the Motel 6 and the Knights Inn, within the hotel rooms that were rented by Bino, Kevi or ther associates;

e.  Bino and Kevi used force, threats of force, fraud, and coercion to cause I.D. to participate in commercial sex acts at the Motel 6 and the Knights Inn;

f.  Bino and Kevi threatened I.D. with violence and used this tactic to cause I.D. to engage in commercial sex acts at the Motel 6 and the Knights Inn;

g.  Bino and Kevi defrauded I.D. by falsely telling her that they would take care of her, and then by forcing her to work as a prostitute for them at the Motel 6 and the Knights Inn;

h.  Bino and Kevi coerced I.D. to participate in commercial sex acts at Defendants' Motel 6 and Knights Inn by threatening I.D. with physical harm if I.D. did not continue to engage in commercial sex acts at the Motel 6 and the Knights Inn;

i. Bino knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited I.D. to engage in commercial sex acts in the rooms at the Motel 6 and the Knights Inn that Bino, Kevi and their associates rented from Defendants;

j. Buyers came to the Motel 6 and the Knights Inn, purchased the "right" to have sex with I.D. from Bino and Kevi, and then the buyers raped I.D. at the Motel 6 and the Knights Inn;

k. I.D. was a minor at the time she was trafficked at the Motel 6 and the Knights Inn; and

l. other actions to be proven at trial.

85. The venture in which Defendants participated affected interstate commerce for numerous reasons, including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of the internet to post sex advertisements, the use of the internet to communicate regarding the sex trafficking venture generally, the use of interstate highways to transport I.D. to the Motel 6 and the Knights Inn, and other reasons to be proven at trial.

86. As shown above, Defendants had – at minimum – constructive knowledge that I.D. was being trafficked for sex at the property. *See* Fed. R. Civ. P. 9(b) ("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

87.    Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its hotel at all relevant times, giving Defendants knowledge of sex trafficking, including the sex trafficking that victimized I.D., and other crimes at the hotel during the relevant period.

### COUNT 2: PREMISES LIABILITY CLAIM

88.    Bino, Kevi and their associates rented the rooms from Defendants at the Motel 6 and the Knights Inn, and I.D. was a guest of Bino, Kevi and his their associates. Thus, I.D. was an invitee of the Motel 6 and the Knights Inn.

89.    At all relevant times, Defendants owed a duty to I.D. to exercise ordinary care in keeping the premises and approaches of the Motel 6 and the Knights Inn safe.  *See* O.C.G.A. § 51-3-1.

90.    Defendants had actual and constructive knowledge of criminal activity at the the Motel 6 and the Knights Inn that made the repeated sex trafficking and sexual assault of I.D. foreseeable to Defendants.

91.    Defendants knew or should have known the steps to take to prevent the Motel 6 and the Knights Inn from being used as a venue for sex trafficking, including I.D.'s minor sex trafficking, sexual assault and other crimes perpetuated on I.D., but negligently failed to deter the crimes or warn I.D.

92.    Defendants were negligent and said negligence proximately caused I.D.'s injuries in the following ways:

a.    negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b.    negligently failing to provide appropriate and effective security personnel during I.D.'s sex trafficking at the Motel 6 and the Knights Inn;

c.    negligently failing to properly inspect and maintain the premises;

d.    negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the Motel 6 and the Knights Inn;

e.    negligently failing to properly retain, hire, train, and supervise said employees;

f.    negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

g.    negligently failing to respond to online reviews and publicly available information;

h.    negligently failing to prevent loitering, pandering, prostitution and trespassing;

i.    negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j.    negligently failing to inspect, patrol, or appropriately monitor the property;

k.    negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols,

inspections, physical, and other landscaping adjustments, and other measures available;

l.     negligently failing to remediate a long history of crime at the Motel 6 and the Knights Inn;

m.    negligently failing to warn invitees of known hazards at the property;

n.     negligently representing to invitees that the property was safe; and

o.     other negligent acts that violated Georgia common law to be proven at trial.

## COUNT 3: NUISANCE CLAIM

93.    Defendants also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly dangerous criminal condition at the Motel 6 and the Knights Inn.

94.    Defendants were aware of the dangerous criminal condition at the Motel 6 and the Knights Inn and negligently allowed that condition to continue.

95.    Defendants maintained a dangerous criminal condition at the Motel 6 and the Knights Inn.

96.    Defendants' creation of and failure to abate a nuisance caused injury to I.D.

97.    Under O.C.G.A. §§ 41-1-3 and 41-1-4, Defendants are liable to I.D. for the injuries she sustained, resulting from Defendants' creation of failure to abate a

nuisance, which caused I.D. injury.

## CAUSATION AND DAMAGES

98.    As a direct and proximate result of Defendants' acts and omissions, I.D. suffered substantial physical, emotional, and psychological harm and other damages.

99.    Defendants are jointly and severally liable with Bino, Kevi, and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to I.D.

100.    I.D. brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

  a.    personal injuries;

  b.    past, present and future pain and suffering;

  c.    disability;

  d.    disfigurement;

  e.    mental anguish;

  f.    loss of the capacity for the enjoyment of life;

  g.    loss of earning capacity;

h.    lost wages;

i.    diminished capacity to labor;

j.    incidental expenses;

k.    past, present and future medical expenses;

l.    permanent injuries;

m.    attorneys' fees;

n.    punitive damages; and

o.    consequential damages to be proven at trial.

101.    Punitive damages should be imposed upon Defendants without limitation or cap for its actions, which are explained more fully above.

102.    Defendants are also liable for paying I.D.'s attorneys' fees and litigation expenses pursuant to the TVPRA and O.C.G.A. § 13-6-11 because Defendants have acted in bad faith in the underlying transaction as shown herein.

103.    Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendants, and one or more or all of the above stated acts were the proximate cause of the injuries and damages sustained by I.D.

## STATUTE OF LIMITATIONS

104.    While I.D.'s respective incidents as alleged in this complaint occurred more than two years ago, I.D.'s traffickers at Defendants' Motel 6 and Knights Inn

have never been convicted.

105.   Upon information and belief, many of the Johns have not been convicted, tolling the statute of limitations on state law claims pursuant to O.C.G.A. § 9-3-99 as all assailants have not been convicted.  *See, e.g., B.W. v. G6 Hospitality Property, LLC*, No. 1:24-cv-00195-JPB, at 11-15 (N.D. Ga. Feb. 11, 2025).

106.   Accordingly, the statute of limitations on I.D.'s premises and nuisance claims were therefore tolled and have not expired.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff I.D. prays for a judgment against Defendants and for the following:

1) That process and summons issue requiring Defendants to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Punitive damages be imposed upon Defendants;

6) Plaintiff be provided with a trial by jury; and

7) Plaintiff receive such other relief as this Court deems just and appropriate under the circumstances.

This 25th day of November, 2025.

/s/ Matthew B. Stoddard
Matthew B. Stoddard
Ga. Bar No.: 558215
Keith N. Evra, Esq.
Ga. Bar No.: 810271
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
keith@legalhelpga.com
**Attorneys for Plaintiff**